IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| BRECEK AND YOUNG ADVISORS, INC., | ) ) ) | |
| Plaintiff, | ) ) | 4:11CV3003 |
| v. | ) ) ) | |
| SYNDICATE 2003, LLOYD'S OF LONDON, and CATLIN SPECIALTY INSURANCE COMPANY, INC., | ) ) ) ) | MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT |
| Defendants. | ) ) ) | |

On February 13, 2012, the plaintiff, Brecek and Young Advisors, Inc. (BYA), filed a three-count second amended complaint against the defendants, Syndicate 2003, Lloyd's of London (Syndicate) and Catlin Specialty Insurance Company, Inc. (Catlin).  (ECF No. 51.)  Now before me is BYA's motion for partial summary judgment.  (ECF No. 62.)  For the following reasons, I find that BYA's motion must be granted in part.

## I.   BACKGROUND[1]

BYA is a California Corporation with its principal place of business in California.  (Pl.'s Statement of Undisputed Facts (Pl.'s Facts) ¶ 1, ECF No. 63.)  Syndicate, which "is a syndicate of certain underwriters at Lloyd's, London," is incorporated pursuant to the laws of the United Kingdom, and its principal place of business is London, England.  (Id. ¶ 3.)  Catlin is a Delaware corporation with its principal place of business in Atlanta, Georgia.  (Id. ¶ 2.)

---

[1] The majority of the material facts in this case are undisputed.  In setting forth the material facts, I shall quote liberally from the statements of facts set forth in the parties' briefs.  I commend BYA, Syndicate, and Catlin for their thorough, well-organized, and efficient presentations of the facts.

On or about January 31, 2008, BYA and Syndicate entered into a contract of insurance titled "Broker/Dealer and Registered Representatives Professional Liability Policy No. 20221" (the Syndicate Policy). (Pl.'s Facts ¶ 5.) The Syndicate Policy states that Syndicate "shall pay, on behalf of an Insured, Damages which the Insured becomes legally obligated to pay because of a Claim that is both made against the Insured and reported to the Insurer in writing during the Policy Period or Discovery Period, if applicable, for a Wrongful Act committed solely in the rendering or failing to render Professional Services for a Client . . . ." (Id. ¶ 9.)[2] It also states that "the Insurer shall have the right and duty to defend any civil litigations or arbitrations against the Insureds that are covered by this Policy." (Id. ¶ 10.) Section IV.B.1 of the Syndicate Policy states,

> The Insured shall pay Damages and Defense Expenses up to the amount of the applicable Retention . . . for each Claim made against such Insured . . . . [T]he Insurer's obligations under this Policy shall not commence until the applicable Retention has been satisfied by the Insured's payment of Defense Expenses and/or Damages. The Retention shall be the sole responsibility of the Insured and will remain uninsured. The Insurer shall pay all Damages and Defense Expenses incurred in each Claim that exceed the Retention.

(Defs.' Response to Pl.'s Statement of Undisputed Material Facts and Additional Statements of Undisputed Facts (Defs.' Facts) ¶ 11A.)[3] The Syndicate Policy also states, "All Claims based upon or arising out [of] the same Wrongful Act or Interrelated Wrongful Acts shall be considered a single Claim . . . ." (Pl.'s Facts ¶ 17.) Relevant terms are defined in the Syndicate Policy as follows: "Claim" means "a written demand received by any Insureds for Damages (including pleadings received in a civil litigation or arbitration) for an actual or alleged Wrongful Act," subject to certain exceptions that are not pertinent at this time. (Pl.'s Facts ¶ 12; Defs.' Facts ¶ 12A.) "Damages"

---

[2] The policy period runs from December 31, 2007, through December 31, 2008, and the Retroactive Date for the Insured Broker/Dealer is December 1, 1996. (Pl.'s Facts ¶ 6.)

[3] Generally, the Syndicate Policy limits are a) $2,000,000 per claim and $2,000,000 in the aggregate for a non-New York Insured Registered Representative; b) $1,000,000 per claim and $1,000,000 aggregate limit for a New York Insured Registered Representative; c) $2,000,000 per claim and $10,000,000 aggregate limit for the Insured Broker/Dealer; and d) $10,000,000 policy aggregate limit. (Pl.'s Facts ¶ 7.) The retentions for the Syndicate Policy are $5,000 per claim for an Insured Registered Representative and $50,000 per claim for the Insured Broker/Dealer. (Id. ¶ 8.)

means "monetary judgments, settlements or awards . . . resulting from a Claim." (Pl.'s Facts ¶ 13.) "Defense Expenses" means "reasonable and necessary fees and costs incurred by or at the direction of the Insurer in the defense of a Claim." (Id. ¶ 14.) "Wrongful Act" means "a negligent act or omission . . . committed by an Insured in the rendering of Professional Services." (Id. at 16.) And "Interrelated Wrongful Acts" means "any Wrongful Acts that are: 1. similar, repeated or continuous; or 2. connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies." (Id. at 15.) The Syndicate Policy also contains a Selling Away Endorsement stating,

> [W]ith respect to any Claims arising out of, based upon or in consequence of, directly or indirectly resulting from or in any way involving Selling Away, the Insured Broker/Dealer shall bear 15% of any Damages incurred as uninsured under this Policy, which amount shall neither reduce the applicable Limit of Liability nor the applicable Retention.

(Id. ¶ 86. See also Pl.'s Index, Koller Aff. Ex. 1 at DEFS2532, ECF No. 65-16.) "Selling Away" is defined as "the sale, attempted sale or servicing of products or services that are not approved and authorized by the Insured Broker/Dealer." (Pl.'s Facts ¶ 87 (quoting Pl.'s Index, Koller Aff. Ex. 1 at DEFS2532, ECF No. 65-16).) The Syndicate Policy states that New York law governs "all issues pertaining to the meaning, interpretation and effect of this Policy and its terms and provisions, as well as the parties' rights and obligations under this Policy, the Insurer's handling of Claims and all other related matters." (Defs.' Facts ¶ 5A.)

On or about February 10, 2009, Catlin and BYA entered into a contract of insurance titled "Broker/Dealer and Registered Representatives Professional Liability Policy No. BDP-93785-1210" (the Catlin Policy). (Pl.'s Facts ¶ 18.) The Catlin Policy is similar to the Syndicate Policy in many respects. Section I.A. of the Catlin Policy states that Catilin "shall pay, on behalf of the Insured, Damages which the Insured becomes legally obligated to pay because of a Claim that is both made against the Insured and reported to the Insurer in writing during the Policy Period for a Wrongful Act committed solely in the rendering or failing to render Professional Services for a Client . . . ." (Id.

3

4:11-cv-03003-WKU-CRZ   Doc # 80   Filed: 11/15/12   Page 4 of 27 - Page ID # 1853

¶ 24.)[4]  It continues, "the Insurer shall have the right to defend any Claim against an Insured for which coverage may be available pursuant to Section 1.A . . . ." (Id. ¶ 25.)  Section V.A of the Catlin Policy states,

> The Insured shall pay Damages and Defense Expenses up to the amount of the Retention . . . for each claim made against such Insured and reported in writing to the Insurer during the Policy Period.  The Insurer's obligations under this Policy shall not commence until the Retention has been satisfied by the Insured's payment of Defense Expenses and/or Damages.  The Retention shall be solely the responsibility of the Insured and shall remain uninsured.  The Insurer shall pay all Damages and Defense Expenses incurred in each Claim that exceed the Retention.

(Defs.' Facts ¶ 26A (quoting Pl.'s Index, Ex. B, Koller Aff. Ex. 2 at DEFS0448, ECF No. 65-17).)[5] Like the Syndicate Policy, the Catlin Policy also states that "[a]ll Claims based upon or arising out [of] the same Wrongful Act or Interrelated Wrongful Acts shall be considered a single claim . . . ." (Pl.'s Facts ¶ 32.)  The definitions of the relevant terms in the Catlin Policy are substantially identical to the definitions appearing the Syndicate Policy, (see Pl.'s Facts ¶¶ 27-31), and like the Syndicate Policy, the Catlin Policy states that "all issues pertaining to the meaning, interpretation and effect of this Policy and its terms and provisions, as well as the parties' rights and obligations under this Policy, the Insurer's handling of Claims and all other related matters" are governed by New York Law, (Defs.' Facts ¶ 18A).

---

[4] The policy period runs from December 31, 2008, through December 31, 2010, and the Retroactive Date for the Insured Broker/Dealer is December 1, 1996.  (Pl.'s Facts ¶ 19.)

[5] Generally, the Catlin Policy limits are a) $1,000,000 per claim and $2,000,000 in the aggregate for an Insured Registered Representative; b) $1,000,000 per claim and $5,000,000 in the aggregate for the Insured Broker/Dealer; and c) $5,000,000 policy aggregate limit.  (Pl.'s Facts ¶ 20.)  Also, unless otherwise specified in the policy, the retentions for the Catlin Policy are $10,000 per claim for an Insured Registered Representative and $100,000 per claim for the Insured Broker/Dealer.  (Id. ¶ 21.)  One exception to these general terms is relevant to the present motion.  The Catlin Policy includes an "Amended Definition of Securities" endorsement that modifies the definition of the term "Securities" to include "specially identified REITs, TICs and 1031 Exchanges, which are on the Insured Broker Dealer's approved product list."  (Id. ¶ 22.)  The limits of liability for claims involving these REITs, TICs and 1031 Exchanges are $250,000 for each claim and $500,000 in the aggregate, and the retention for these claims is $100,000.  (Id. ¶ 23.)

4

On February 13, 2012, BYA filed a second amended complaint alleging that Syndicate and Catlin breached the aforementioned policies, that Syndicate and Catlin breached their duties of good faith and fair dealing, and that BYA is entitled to a declaration of its rights regarding certain open claims. (See generally Second Am. Compl., ECF No. 51.) Four sets of claims made by BYA against the Syndicate or Catlin Policies are relevant to the instant motion.

### A.    The DBSI Claims

On or about October 3, 2008, BYA notified Lancer Claims Services (Lancer) "of a potential claim or potential claims [under the Catlin Policy] involving private placements including 1031 exchanges through DBSI, a product sponsor." (Pl.'s Facts ¶ 33; Defs.' Facts ¶ 33. See also Pl.'s Facts ¶ 35; Pl.'s Index, Ex. A, Miller Aff. Ex. 1, ECF No. 64-2.)[6] Thereafter, Goom Sook Lee (and her two companies), Bill Murphy, and Kline Enterprises, Inc. filed arbitration claims with the Financial Industry Regulatory Authority (FINRA) involving Tenancy in Common interests (TICs) promoted by DBSI. (See Pl.'s Index, Ex. A, Miller Aff. Exs. 2, 4, 9, ECF Nos. 64-3, 64-5, 64-10.) Each of these three arbitration claims will be discussed briefly in turn.

The Lee claim was filed against BYA and Securities America, Inc. (SAI)[7] on June 5, 2009. (Pl.'s Facts ¶ 38.) In her statement of claim, Lee, who resided in Portland, Oregon, alleged that BYA and its registered representative Sok Cordell sold her two TICs in real estate projects that were promoted and managed by DBSI. (Id. ¶ 39.) She alleged that "DBSI would locate real property to purchase and also locate investors to purchase tenant in common interests in the real estate at a substantial markup. DBSI would enter into a Master Lease or Land Management Agreement with the TIC owners and would guarantee the investors a stream of income from the property plus the potential for substantial profit upon the sale of the real estate." (Id. ¶ 40.) On or about April 18, 2008, Lee invested $1,906,864.27 in two such TICs: the Oakwood Plaza TIC, which involved real estate in Alton, Illinois, and the Villago North TIC, which involved real estate in Casa Grande,

---

[6] The parties' briefs indicate that Lancer was the claims administrator for Catlin and Syndicate. (See Pl.'s Facts ¶ 89.)

[7] It appears that at some unspecified time, SAI purchased BYA and became BYA's "successor corporation." (See, e.g., Pl.'s Index, Ex. A, Miller Aff. Ex. 2 at BYA048058, ECF No. 64-3.)

Arizona. (Id. ¶ 41.) According to Lee, it was "misrepresented" to her that "the DBSI investment products had undergone a rigorous due diligence process" and that the products were "safe, secure and conservative investments" that were "suitable" for her. (Defs.' Facts ¶ 39C.) Lee's claim also states that DBSI and its affiliates are in bankruptcy, and the promised stream of payments from the property ceased by October 2008. (Pl.'s Facts ¶ 42.) There is no dispute that the Catlin Policy applies to Lee's claim, (id. ¶ 35), and as noted previously, the policy's single claim limit of liability is $250,000 and its aggregate limit of liability is $500,000 for claims involving TICs and 1031 Exchanges, (id. ¶ 36). On January 20, 2010, Catlin sent a determination letter to SAI regarding Lee's claim. (Id. ¶ 43.) The letter recites the aforementioned limits of liability, asserts that the Insured Broker/Dealer is responsible for a retention of $100,000 for each claim, and states that the policy's limits of liability and retentions "are inclusive of Damages and Defense Expenses." (Id.) The letter also states that Catlin fully reserved its rights under the policy, including its right to assert that it had no duty to defend or to indemnify the Insureds. (Defs.' Facts ¶ 43A.) In July 2010, the Lee case settled for an amount in excess of the $250,000 limit, and Catlin contributed $250,000 toward the settlement. (Id. ¶ 45.)

The Murphy claim was filed against William Rice, Douglas Swenson, John Mayerson, Ameriflex Financial Services, and SAI on January 20, 2009. (Pl.'s Facts ¶ 46.) Murphy, a resident of Westlake Village, California, alleged that he was interested in a 1031 exchange to reduce his tax burden after he sold his share of an inherited property, and ultimately he was referred to DBSI and to William Rice. (Id. ¶¶ 46-47.) In August 2008, Murphy invested in a DBSI project known as E-470 East LLC (E-470) through Rice and BYA. (Id.) E-470 involved vacant land in Aurora, Colorado, which DBSI planned to develop and then sell in two years. (Id. ¶ 48.) Allegedly, Murphy was told that he would receive interest payments, that his investment was secured by land, and that at worst, he and the other investors would own the land "free and clear." (Id.) Murphy also alleged that the E-470 TIC "had been misrepresented as being 'thoroughly researched' and 'recommended for purchase.'" (Defs.' Facts ¶ 48B.) After making the investment, Murphy learned that DBSI "cashed out" the investors' equity by taking out a mortgage on the property. (Pl.'s Facts ¶ 49.) Shortly thereafter, DBSI filed for bankruptcy, the development of the property ceased, and Murphy did not receive any interest payments on the property. (Id.) On June 16, 2010, Catlin advised BYA

6

via letter that it agreed to participate in the defense of Murphy's claim, subject to a reservation of rights.  (Id. ¶ 50.)

On June 3, 2010, Kline Enterprises, a California Corporation, filed a claim against SAI, BYA, William Rice, and Thomas Goodson. (Pl.'s Facts ¶ 55.)  The claim states that Joanne Kresse, who was an owner and the president of Kline Enterprises, sought financial advice from BYA in approximately April 2008.  (Id. ¶ 56.  See also Pl.'s Index, Miller Aff. Ex. 9 at BYA000885, ECF No. 64-10.)  Goodson and Rice presented Kresse with a number of investment options for a Section 1031 Tax Deferred Exchange, and "the most attractive" of the options were those promoted by DBSI.  (Id.)  In May and June 2008, Kline Enterprises invested more than $3,400,000 in two DBSI projects known as Echo Ridge III and Echo Ridge IV, which were located in Canyon County, Idaho. (Id. ¶ 57.)  According to Kline Enterprises, the investment contracts consisted of four separate agreements between Kline Enterprises and a DBSI subsidiary; DBSI was to pay monthly option payments equal to a 7% annualized return; and DBSI had the option to buy the real estate at a "Strike Price" that would provide an additional 3% profit.  (Id. ¶ 58.)  DBSI filed for bankruptcy protection, however, and the promised payments stopped by October 2008.  (Id. ¶ 59.)  In a letter dated July 14, 2010, Catlin stated that it would participate in BYA's, Goodson's, and Rice's defense of Kline Enterprises' arbitration claim.  (Id. ¶ 60.)  Catlin also stated, however, that it had "received notice of other matters [arising] out of the sale of DBSI," including the Lee case, and Catlin reserved the right to treat all matters involving DBSI as a single claim subject to a $250,000 limit of liability. (Id.)

In October 2010, Catlin sent letters to BYA stating that Catlin was no longer obligated to defend or indemnify BYA with respect to the Murphy or Kline Enterprises claims. (Pl.'s Facts ¶ 61. See also id. ¶ 51.)  Catlin asserted that the Lee, Murphy, and Kline Enterprises claims arose "out of the same 'Wrongful Act' and 'Interrelated Wrongful Acts,' and thus constitute[d] a single claim under the policy, subject to a single per claim limit of liability in the amount of $250,000."  (Id. ¶¶ 51, 61.)  Catlin added that because it contributed $250,000 toward settlement of the Lee claim, it had no further liability under the Catlin Policy for the Murphy or Kline Enterprises claims.  (Id. ¶¶ 51, 61.)  Catlin also asserted that even if the Lee, Murphy, and Kline Enterprises claims were treated as

separate claims, a $100,000 retention would apply to each claim, and the amount of the Murphy settlement would not exceed that retention.  (Id. ¶¶ 52, 54.)

BYA claims that it is entitled to a declaration that the Lee, Murphy, and Kline Enterprises claims do not arise from Interrelated Wrongful Acts because the claims "relate to independent sales of financial products to unrelated customers."  (Second Am. Compl. ¶¶ 69, 71.)

## B.    The Mechikoff Claims

On or about June 18, 2009, Hugo Kaji filed a FINRA arbitration claim against The Seidler Companies Incorporated (The Seidler Companies), Richard Mechikoff, Jr. (Mechikoff), and SAI. (Pl.'s Facts ¶ 63.)  On September 10, 2009, Kaji, who was represented by Scott R. Shewan, filed an amended claim that dismissed SAI and substituted BYA.  (Id.)  BYA served notice of the arbitration on Catlin, and on October 12, 2009, Catlin agreed to defend BYA in the Kaji arbitration pursuant to the Catlin Policy, subject to a reservation of rights and a $100,000 retention.  (Id. ¶¶ 64-65.)

Kaji's amended claim states that Kaji was an elderly man residing in California who invested with Mechikoff.  (Id. ¶ 66.)  Allegedly, Mechikoff "improperly invested in aggressive stocks" and "aggressively invested in Arrhythmia Research Technology, Inc." (HRT).  (Id.)  According to Kaji, Mechikoff decided to "load up all his clients' accounts" in HRT stock during the spring of 2005, and he did so by "either recommend[ing] the stock for everyone or simply [going] out and [buying] it without prior authorization."  (Id. ¶ 67.)  There is no allegation that Mechikoff recommended the stock through a "common presentation" to his customers, however.  (Defs.' Facts ¶ 67A.) Nevertheless, Kaji's amended claim states that Mechikoff's clients held 20% of the float in HRT at its peak, and 130 accounts under Mechikoff's control held HRT stock.  (Pl.'s Facts ¶ 68.)  It also states that due to Mechikoff's "unsuitable trading in [HRT] and other aggressive stocks," Kaji's "assets were reduced significantly."  (Pl.'s Index, Miller Aff. Ex. 15 at BYA091322, ECF No. 64-16.)

On or about April 30, 2010, Rose Eager-Sabo filed a FINRA arbitration claim against The Seidler Companies and BYA.  (Pl.'s Facts ¶ 69.)  There is no dispute that the Catlin Policy applied to Eager-Sabo's claim.  (Id. ¶ 74.)  Like Kaji, Eager-Sabo was represented by Scott R. Shewan, and her claim includes allegations that Mechikoff acted improperly when investing her assets.  (Id.) Specifically, Eager-Sabo alleged that she was an elderly woman residing in California who invested

with Mechikoff, that Mechikoff improperly invested in aggressive stocks, and that Mechikoff aggressively invested in HRT. (Id. ¶ 71.) She also alleged that Mechikoff decided to "load up all his clients' accounts" in HRT stock during the spring of 2005, that "Mechikoff either recommended the stock for everyone or simply went out and bought it without prior authorization," that Mechikoff's clients held 20% of the float in HRT at its peak," and that "130 accounts under Mechikoff's control held this stock." (Id. ¶¶ 72-73.) There was no allegation that Mechikoff's recommendation of HRT stock was made through a common presentation to his customers. (Defs.' Facts ¶ 72A.)

On or about April 5, 2010, Joseph McClintic, who also was represented by Scott R. Shewan, filed a FINRA arbitration claim against The Seidler Companies and BYA. (Pl.'s Facts ¶ 75.) Notice of the claim was provided to Catlin, and Catlin issued a letter on January 18, 2011, stating that it would participate in BYA's defense of the arbitration subject to a reservation of rights. (Id. ¶¶ 76-77.) There is no dispute that the Catlin Policy applies to McClintic's claim. (Id. ¶ 81.) McClintic alleged that he was an elderly man residing in California who invested with Mechikoff; that Mechikoff improperly invested in aggressive stocks; that Mechikoff aggressively invested in HRT; that Mechikoff decided to "load up all his clients' accounts" in HRT stock during the spring of 2005; that "Mechikoff either recommended the stock for everyone or simply went out and bought it without prior authorization"; that Mechikoff's clients held 20% of the float in HRT at its peak; and that 130 accounts under Mechikoff's control held this stock. (Id. ¶¶ 78-80.) Again, there was no allegation that Mechikoff recommended HRT stock through a common presentation to his customers. (Defs.' Facts ¶ 79A.)

BYA seeks a declaration that the Kaji, Eager-Sabo, and McClintic claims arise out of Interrelated Wrongful Acts (as that term is defined in the Catlin Policy), and therefore they constitute a single claim subject to a single retention. (See Pl.'s Br. at 15, ECF No. 63; Second Am. Compl. ¶ 181, ECF No. 51.)

### C.    The Forward Investments/Shaw Claims

In a letter dated October 3, 2008, BYA notified Lancer "of a potential claim or potential claims involving an unknown number of clients and/or individuals identifying themselves as clients of the firm and their purported participation in an 'investment club' known as Forward Investments

Group, LLC and/or Forward Investments, LLC." (Pl.'s Facts ¶ 82; Pl.'s Index, Miller Aff. Ex. 23, ECF No. 64-24.) Ultimately, four claimants or groups of claimants filed arbitration claims concerning Forward Investments. (E.g., Pl.'s Facts ¶ 84; Defs.' Facts ¶ 84.) The circumstances surrounding each of these four sets of claims will be described briefly below.

First, on or about November 19, 2008, Dona Hannigan filed a statement of claim with FINRA against BYA, Kelvin Shaw, Jennifer Himes, Leia Farmer, Roxanne Brecek, Kyle Kelly, Christopher Ranney, and other unnamed persons. (Pl.'s Index, Miller Aff. Ex. 26, ECF No. 64-27.) In her statement of claim, Hannigan alleged that beginning in approximately 2007, Shaw and Himes placed Hannigan in unsuitable investments, failed to diversify her investments, engaged in unauthorized and excessive trading, and placed their interest in commissions ahead of their customer's interests. (Pl.'s Facts ¶ 91.) Hannigan also alleged that Shaw and Himes sold her a contract in Forward Investments, which was an investment not approved or authorized by BYA, in approximately February and March 2008. (Id. ¶ 92.) Hannigan made the investment after Shaw represented to her that he gained over $500,000 by investing in Forward Investments. (Id.) According to Hannigan, however, "Forward Investments was a fraud and . . . it and its sales manager, Robert Bame, had been charged by regulators with committing commodity pool fraud." (Id. ¶ 93.) Hannigan added that "Shaw and Himes aided and abetted Forward Investments and Bame's fraudulent schemes by soliciting Hannigan and other investors to invest in Forward Investments and by representing that the investments were suitable, conservative, and safe." (Id.) Hannigan did not allege, however, that there was "a common meeting or investment pool through which customers were induced to make[,] or made[,] purchases in Forward Investment Group." (Defs.' Facts ¶ 92A.) BYA notified Lancer about Hannigan's claims, and Lancer issued a letter on behalf of Syndicate stating that Syndicate agreed to defend BYA subject to a full reservation of rights. (Pl.'s Facts ¶¶ 89-90, 94.)

Second, on or about October 1, 2008, a group of individuals that the parties refer to as "the Peralta Plaintiffs" filed a complaint in the Superior Court of Riverside County, California, against Bame, Shaw, Himes, BYA, Forward Investment Group, Forward Investment Management, Links Asset Management, and Jack Roberts. (Pl.'s Index, Miller Aff. Ex. 28, ECF No. 64-29. See also

10

Pl.'s Facts ¶ 95.)[8]  The Peralta Plaintiffs alleged that beginning in approximately 2007, Shaw and Himes recommended that the Peralta Plaintiffs invest money in Forward Investments; Shaw and Himes falsely represented that an investment in Forward Investments would be safe; the Peralta Plaintiffs each made investments in Forward Investments; Shaw and Himes provided false information about the value of Forward Investments at the time of the sale; the Peralta Plaintiffs were provided false and misleading statements about the value of their investments; and the Peralta Plaintiffs lost most of their investments.  (Pl.'s Facts ¶¶ 97, 103.)  The Peralta Plaintiffs did not allege that there was "a common meeting or investment pool through which customers were induced to make[,] or made[,] purchases in Forward Investment Group."  (Defs.' Facts ¶ 103A.)  On January 28, 2009, Lancer informed BYA that Syndicate agreed to defend BYA subject to a full reservation of rights.  (Pl.'s Facts ¶ 98.)  On September 17, 2010, Syndicate sent a coverage letter to BYA stating that because six of the Peralta Plaintiffs were not clients of BYA, there would be no indemnity coverage for losses sustained by these particular plaintiffs.  (Id. ¶ 104.)  The letter also states that each of the remaining claims in the Peralta Litigation might represent separate claims subject to separate retentions, but for the purposes of settlement and subject to a full reservation of rights, Syndicate would consider these plaintiffs' claims in two groups of interrelated claims, with each group subject to a separate $100,000 retention.  (Pl.'s Facts ¶ 101; Defs.' Facts ¶¶ 101A-101B.)[9]

---

[8] The Peralta Plaintiffs amended their complaint twice.  The second amended complaint includes additional plaintiffs and defendants and new factual allegations.  (Pl.'s Facts ¶¶ 99-100.)

[9] In pertinent part, the September 17, 2010, letter states,

The lawsuit was commenced by sixteen plaintiffs.  Six of the plaintiffs are not clients of BYA.  The remaining ten plaintiffs fall into two categories – those that were BYA clients when they invested in Forward, and those that became BYA clients after they invested in Forward.  Of these plaintiffs, Danisa Peralta, Gabriel Peralta and Gabriela Peralta are members of the same family.  Furthermore, Gabriel Peralta, Gabriela Peralta, Joshua Welton, Michael Doblado and Rose Kampilla were referred to Mr. Shaw by Danisa Peralta and subsequently based their decision to invest in Forward on the performance of Danisa Peralta's investment.  Michael and Lorie Herrick were referred to Mr. Shaw by their son, Joshua Welton, after he was referred to Mr. Shaw by Danisa Peralta.  Regardless of these personal relationships, each of the claimants had varying investment objectives and purchased unapproved products at different times for different

11

Third, on November 18, 2008, BYA notified Lancer of an allegation that there had been "churning" in Stephen Borowski's account. (Pl.'s Facts ¶ 105.) On January 7, 2009, Lancer asserted that because no demand for damages had been made, no claim yet existed. (Id.) On or about April 21, 2009, however, Stephen and Annette Borowski filed a statement of claim with FINRA against BYA, Shaw, Legacy Financial Services, Inc., and Regan Holding Corporation. (Id. ¶ 106. See also Pl.'s Index, Miller Aff. Ex. 35, ECF No. 65-5.) The Borowskis alleged that Shaw engaged in unauthorized and excessive trading, sold "unsuitable, overly concentrated and high commission securities," and sold the Borowskis an interest in Forward Investments prior to Robert Bame's indictment for fraud. (Id. ¶ 107.) BYA gave Catlin notice of the arbitration, and Catlin acknowledged receipt of the notice in a letter dated July 8, 2009. (Id. ¶ 108.) On or about December 4, 2009, the Borowski's filed an amended claim. (Id. ¶ 109.) Like the original claim, the amended claim alleges that Shaw engaged in unauthorized and excessive trading, sold unsuitable, overly-concentrated, and high-commission securities to the Borowskis, fraudulently represented that an investment with Forward Investments was a safe and secure way to make money, and improperly sold the Borowskis an interest in Forward Investments. (Id.) The amended statement of claim does not allege that there had been "a common meeting or investment pool through which customers were induced to make[,] or made[,] purchases in Forward Investment Group." (Defs.' Facts ¶ 109A.) There is no dispute that the Syndicate Policy applied to the Borowski's arbitration, and Syndicate participated in BYA's defense. (Pl.'s Facts ¶ 110.)

------------------------------------------------------------

purposes. However, each of the individual demands asserted in the action could represent separate "Claims," subject to separate Retentions under the policy. However, [for the] purposes of settlement only, and subject to a full reservation of rights, Syndicate 2003 may consider the claims made by plaintiffs Danisa Peralta, Gabriel Peralta, Gabriela Peralta, Joshua Welton, Michael Doblado, Michael and Lori Herrick and Rose Kampilla as a single Claim, subject to a single $100,000 Retention, because they arise out of the same Wrongful Act or "Interrelated Wrongful Acts." Similarly, the claims made by plaintiffs Donna Fors, the Brozio Family Trust and Brenda MacKinnon may also represent a single Claim, subject to a single $100,000 Retention. Accordingly, BYA is responsible for $200,000 in Retentions for the lawsuit.

(Pl.'s Index, Miller Aff. Ex. 32 at BYA041829-30, ECF NO. 65-2.)

Finally, on or about April 23, 2009, Diane Homis and the LaDuke Family Trust filed a claim with FINRA against BYA, Shaw, and Himes. (Pl.'s Index, Miller Aff. Ex. 40, ECF No. 65-10.) The claim alleges that Homis lost all of her money after Shaw invested it in Forward Investments, and Shaw and Hines falsely reported to Homis that her investments doubled in value. (Pl.'s Facts ¶ 112.) The claim does not allege that customers were induced to make, or made, investments in Forward Investments through a "common meeting or investment pool." (Defs.' Facts ¶ 112A.)

In short, the Hannigan, Peralta, Borowski, and Homis claims each allege that Shaw (and sometimes Himes) sold the claimants investments in Forward Investments, which proved to be "a fraudulent investment." (Pl.'s Facts ¶ 84.) Syndicate has maintained that these claims do not involve Interrelated Wrongful Acts and are therefore subject to separate retentions. (Id. ¶ 88; Defs.' Facts ¶ 88.) BYA seeks a declaration that the claims do "arise from interrelated wrongful acts, . . . should be treated as a single claim, and are subject to the single per claim retention." (Second Am. Compl. ¶ 186, ECF No. 51.)

### D.   The Straub and Lawrence Claims

Sometime prior to March 17, 2009, attorney Michael Elliot filed a FINRA arbitration claim on behalf of Robert and Erik Straub against BYA, SAI, B & G Financial Network, Inc. (B & G), Daniel Gergel, Kevin Farrar, Frederick Brandt, and Michael Snyder, Jr.. (Pl.'s Index, Miller Aff. Ex. 41, ECF No. 65-11. See also Pl.'s Facts ¶ 113, 116.) BYA provided notice of the claim to Catlin (via Lancer) on March 27, 2009. (Pl.'s Facts ¶ 114.) The Straub claim alleges that Robert Straub and his wife were an elderly couple living in Ohio. (Id. ¶ 115.) They were customers of BYA, B & G, "and their registered representative employees" Gergel, Farrar, Brant, and Snyder, Jr. (collectively, "the Straub Respondents"). (Id.) Beginning in 2005 and 2006, the Straub Respondents allegedly sold the Straubs three Allianz Life Insurance Co. annuities to replace three American National Insurance Co. annuities that had been purchased just over a year previously. (Id.) These transactions resulted "in surrender fees, costs, and expenses that would not have been incurred but for the inappropriate investments." (Id.) There is no allegation that the Straubs were induced to make unsuitable investment purchases or decisions through "a common meeting or presentation." (Defs.' Facts ¶ 115A.)

13

On October 9, 2009, BYA received notice that Eugene and Margaret Lawrence filed an arbitration claim against BYA, B & G, Gergel, Farrar, Brandt, Michael Snyder, Sr., and Fred Balser (collectively, "the Lawrence Respondents"). (Pl.'s Facts ¶¶ 117-118. See also Pl.'s Index, Miller Aff. Ex. 43, ECF No. 65-13.) Like the Straubs, the Lawrences were represented by Michael Elliot. (Pl.'s Facts ¶ 119.) The Lawrences alleged that they were an elderly couple living in Ohio, and they were customers of the Lawrence Respondents. (Id. ¶ 118.) In 2004, the Lawrence Respondents sold five Allianz Life Insurance Co. annuities to the Lawrences to replace five American National Insurance Co. annuities that had been purchased just over a year previously. (Id.) These transactions resulted in surrender fees, costs, and expenses that would not have been incurred otherwise. (Id.) Again, there is no allegation that the Lawrences were induced to make unsuitable investment purchases or decisions through a common meeting or presentation. (Defs.' Facts ¶ 118A.) On March 17, 2010, Catlin issued a determination letter to BYA stating that the Catlin Policy applied to the Lawence claim, and a $100,000 retention applied. (Pl.'s Facts ¶ 120.)

BYA seeks "a declaration that the Straub and Lawrence claims arise from interrelated wrongful acts, . . . should be treated as a single claim, and are subject to the single per claim retention." (Second Am. Compl. ¶ 195, ECF No. 51.)

## II.   STANDARD OF REVIEW

A motion for summary judgment shall be granted by the court "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "might affect the outcome of the suit under the governing law," and a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See also Haigh v. Gelita USA, Inc., 632 F.3d 464, 468 (8th Cir. 2011). In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party, Adickes v. S. H. Kress & Co., 398 U.S. 144, 157 (1970), and the court must not weigh evidence or make credibility determinations, Anderson, 477 U.S. at 249.

It is the moving party's burden to establish that no genuine issue of material fact exists. Fed. R. Civ. P. 56(a); Adickes, 398 U.S. at 157. Therefore, if the moving party does not meet its initial

burden, summary judgment must be denied even if no affidavits or other evidence have been submitted in opposition to the motion. See Adickes, 398 U.S. at 159-60. After the moving party has met its burden, however, "the non-moving party may not rest on the allegations of his pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." Singletary v. Missouri Dept. of Corrections, 423 F.3d 886, 890 (8th Cir. 2005).

The interpretation of a contract is a question of law, and in this case the substantive law of the State of New York governs my analysis of the policies. See, e.g., Missouri Bank and Trust Co. of Kansas City v. OneBeacon Insurance Company, 688 F.3d 943, (8th Cir. 2012). See also Quanta Lines Ins. Co. v. Investors Capital Corp., No. 06 Civ. 4624, 2009 WL 4884096, at *9 (S.D.N.Y. Dec. 17, 2009) ("Under New York law, the interpretation of a contract 'is a matter of law for the court to decide,'" and "[s]ummary judgment may be granted where the words of a contract convey a definite and precise meaning without ambiguity." (citations omitted)).

> In deciding how to interpret an insurance contract, a court undertakes a three-part analysis. First, the Court must determine "whether the contract is unambiguous with respect to the question disputed by the parties." [International Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002).] If the Court determines that a contract is not ambiguous, it "should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence and . . . may then award summary judgment." Id. (quoting Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's London, 136 F.3d 82, 86 (2d Cir. 1998)). An insurance contract is ambiguous where its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." Id. (citation and internal quotation marks omitted). "The language of a contract is not made ambiguous simply because the parties urge different interpretations." [Seiden Assocs., Inc. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992).] Second, if "a court concludes that an insurance provision is ambiguous, the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." Morgan Stanley Group Inc. v. New Eng. Ins. Co., 225 F.3d 270, 275-76 (2d Cir. 2000) (citation and internal quotation marks omitted). Third, "[i]f the extrinsic evidence does not yield a conclusive answer as to the parties' intent, [the] court may apply other rules of contract construction, including the rule of contra proferentem, which generally provides that where an insurer drafts a policy any ambiguity in [the] . . . policy should be resolved in favor of the insured." Id. at 276 (citation and internal quotation marks omitted).

Quanta Lines, 2009 WL 4884096, at *9 (internal quotation marks omitted).

### III.   ANALYSIS

BYA seeks partial summary judgment in its favor on the issue of whether the various groups of arbitration claims outlined in Part I of this memorandum are, or are not, Interrelated Wrongful Acts under the terms of the Syndicate and Catlin Policies.  Specifically, BYA seeks a declaration that 1) the Lee, Murphy, and Kline Enterprises claims (i.e., the DBSI claims) do not involve Interrelated Wrongful Acts and constitute three separate claims under the governing policy; 2) the Kaji, Eager-Sabo, and McClintic claims (i.e., the Mechikoff claims) involve Interrelated Wrongful Acts and constitute one claim under the governing policy; 3) the Hannigan, Peralta, Borowski, and Homis claims (i.e., the Forward Investments/Shaw claims) involve Interrelated Wrongful Acts and constitute one claim under the governing policy; and 4) the Straub and Lawrence claims involve Interrelated Wrongful Acts and constitute one claim under the governing policy.  (Pl.'s Br. at 1-2, ECF No. 63.)

As noted previously, both policies define Interrelated Wrongful Acts as "any Wrongful Acts that are: 1. similar, repeated, or continuous; or 2. connected by reason of any common fact, circumstance, situation, transaction, casualty, event, decision or policy or one or more series of facts, circumstances, situations, transactions, casualties, events, decisions or policies." (Pl.'s Index, Koller Aff. Ex. 1 at DEFS2513, ECF No. 65-16; id., Koller Aff. Ex. 2 at DEFS0441, ECF No. 65-17.)  The policies also state that "[a]ll Claims based upon or arising out [of] the same Wrongful Act or Interrelated Wrongful Acts shall be considered a single Claim."  (Pl.'s Index, Koller Aff. Ex. 1 at DEFS2522, ECF No. 65-16; id., Koller Aff. Ex. 2 at DEFS0449, ECF No. 65-17.)  Although the parties urge different interpretations of these provisions, none argues that any of the provisions are ambiguous.  I find that the relevant portions of the policies are not ambiguous; therefore, I shall interpret the terms in accordance with the plain language of the definitions set forth in the policies, and I shall not consider any extrinsic evidence.  E.g., Quanta Lines, 2009 WL 4884096, at *9.

BYA urges me to apply the "sufficient factual nexus" test described in Quanta Lines to determine whether the various sets of claims at issue in this case are Interrelated Wrongful Acts. (See Pl.'s Br. at 3-7, ECF No. 63.)  In Quanta Lines, the United States District Court for the Southern

District of New York analyzed a policy that included the same definition of "Interrelated Wrongful Acts" that appears in the Syndicate and Catlin Policies. See 2009 WL 4884096, at *2. The court stated, "To establish that a prior Claim is interrelated with a subsequent Claim, the Claims must share a 'sufficient factual nexus.'" Id. at *14 (citations omitted). "A sufficient factual nexus exists where the Claims 'are neither factually nor legally distinct, but instead arise from common facts' and where the 'logically connected facts and circumstances demonstrate a factual nexus' among the Claims." Id. (citation omitted). The court then applied this test and concluded that a claim referred to as "the Alston Letter" shared a sufficient factual nexus with a set of arbitration claims brought by different claimants, and therefore the Alston Letter and the arbitration claims were "Interrelated Wrongful Acts." Id. In reaching this conclusion, the court noted that the Alston Letter and the arbitration claims each alleged that Joseph Jones, a former registered representative of Investors Capital Corporation (ICC), sold unregistered BAB Productions securities to the complaining parties, and ICC failed to supervise Jones properly. Id.

The defendants appear not to dispute that the "sufficient factual nexus" test applies in this case, but they argue that "the standard described and proposed by [BYA] is not consistent with the law that has been established by the New York courts." (Def.'s Br. at 19, ECF No. 77.) In the defendants' view, "a claim by a particular individual for similar actions directed toward that individual over a period of time will be interrelated and subject to the limitations and retentions applicable to a single claim,"[10] but "claims by other individuals for similar (but distinct) actions during the same period are not interrelated under the policy." (Id. at 17 (emphasis in original).) The defendants add that the cases cited by BYA, including Quanta Lines, are unpublished and therefore less authoritative than certain published decisions reached by the United States District Court for the Eastern District of New York. (Id. (citing American Int'l Specialty Lines Ins. Co. v. National Assoc. of Business Owners and Professionals, 324 F. Supp. 2d 353 (E.D.N.Y. 2004); Home Ins. Co. of Illinois (New Hampshire) v. Spectrum Information Technologies, Inc., 930 F. Supp. 825 (E.D.N.Y. 1996)).)

---

[10] I take it that the defendants mean to say that if a series of actions affect a single individual over a period of time, those actions will be considered part of a single claim.

To the extent that the defendants argue that <u>Quanta Lines</u> is not persuasive authority and that claims brought by different claimants cannot involve interrelated wrongful acts, I must reject their argument.  It is true that in both <u>American International Specialty Lines</u> and <u>Home Insurance Company</u>, the courts indicated that claims brought by different individuals were not interrelated.  <u>See American Int'l Specialty Lns., Co.</u>, 324 F. Supp. at 359-60; <u>Home Ins. Co. of Illinois (New Hamphire)</u>, 930 F. Supp. 2d at 847-48.  Nevertheless, it is also true that in both of these cases, the term "interrelated wrongful acts" was not defined in the policies.  BYA argues persuasively that "courts interpret interrelated wrongful acts provisions differently depending on whether the term is further defined in the relevant policy."  (Pl.'s Reply Br. at 9, ECF No. 78.)  When the term is not defined, it is construed narrowly and more significant overlap is necessary before claims will be deemed interrelated.  (<u>See id.</u> at 10 (citing <u>Stauth v. National Union Fire Ins. Co. of Pittsburgh</u>, No. 97-6437, 1999 WL 420401, at *7-8 (10th Cir. 1999)).)  Courts may also find that the undefined term is ambiguous, which may in turn lead them to use rules of construction to interpret the term.  <u>See Home Ins. Co. of Illinois (New Hampshire)</u>, 930 F. Supp. 2d at 848.  When the term "interrelated wrongful acts" is defined as broadly as it is in the Syndicate and Catlin Policies, however, courts "have been much more willing to find acts to be 'interrelated.'"  <u>Stauth</u>, 1999 WL 420401, at *9.  In short, <u>American International Specialty Lines</u> and <u>Home Insurance Company</u> are readily distinguishable from the instant case because the term "interrelated wrongful acts" is not defined in the policies, and therefore those courts' analyses of the term are not helpful to me.  In contrast, <u>Quanta Lines</u>, which involved the interpretation of language identical to the Interrelated Wrongful Acts provisions appearing in the Syndicate and Catlin Policies, is persuasive authority, and it stands for the proposition that claims brought by different investors can, indeed, be interrelated wrongful acts under certain circumstances.

I shall proceed to analyze the groups of arbitration claims outlined above to determine whether or not they amount to Interrelated Wrongful Acts within the meaning of the policies.  In so doing, I shall apply the "sufficient factual nexus" test to assess the claims interrelatedness.  Also, to the extent that the authorities cited by the parties are persuasive, I shall apply them to aid my analysis.

18

### A.   The DBSI Claims

BYA argues first that the Lee, Murphy, and Kline Enterprises claims do not arise out of Interrelated Wrongful Acts.  (Pl.'s Br. at 8-12, ECF No. 63.)  I disagree.

BYA concedes that each of the claims involve TIC interests in real estate projects promoted by DBSI.  Nevertheless, it argues that "the claims differ in several significant ways."  (Pl.'s Br. at 9, ECF No. 63.)  First, BYA notes that some of the claimants reside in different states: Lee is a resident of Oregon, Murphy is a resident of California, and Kine Enterprises is a California corporation.  Second, the TIC interests purchased by the claimants involved real estate located in different parts of the country.  Lee's investments involved real estate located in Alton, Illinois, and Casa Grande, Arizona; Murphy's investment involved real estate in Aurora, Colorado; and Kline Enterprises' investments involved real estate in Canyon County, Idaho.  Third, the three claims involved different registered representatives.  Lee was assisted by BYA representative Sok Cordell, Murphy was assisted by BYA representative William Rice, and Kline Enterprises was assisted by William Rice and Thomas Goodson.  Fourth, and relatedly, BYA argues that "[t]he allegations in the Lee, Murphy, and Kline Enterprises cases . . . do not suggest a common scheme or plan."  (Pl.'s Br. at 10, ECF No. 63.)  BYA adds, "No claimant alleges that the various registered representatives came together and hatched a plan to push TICs sponsored by DBSI on customers.  In fact, nothing suggests that Sok Cordell, based in Oregon, ever worked with or even knew Thomas Goodson or William Rice, based in California."  (Id.)

BYA's argument that the claims are not Interrelated Wrongful Acts hinges mainly on the absence of a "common scheme or plan."  Indeed, BYA submits that "[t]he lack of a common scheme or plan alone forecloses any conclusion that these claims arise out of interrelated wrongful acts."  (Pl.'s Br. at 11, ECF No. 63.)  In support of this point, BYA cites Brecek & Young Advisors v. Lloyds of London Syndicate 2003, No. 09-2516-JAR, 2011 WL 4688837, at *8 (Oct. 6, 2011) (Lloyds II).[11]  Although Lloyds II does offer some support for BYA's position, it does not stand for

---

[11] BYA refers to an earlier decision in the same case as "Lloyds I."  (See Pl.'s Br. at 5, ECF No. 63 (citing Brecek & Young Advisors v. Lloyds of London Syndicate 2003, No. 09-2516-JAR, 2011 WL 1060955 (D. Kan. Mar. 21, 2011)).)  In the interest of clarity, I shall maintain the case name designations used by BYA.

19

the proposition that "the lack of a common scheme or plan <u>alone</u>" prevents me from concluding that the Lee, Murphy, and Kline Enterprises claims arise out of Interrelated Wrongful Acts.  (Pl.'s Br. at 11, ECF No. 63 (emphasis added).)  On the contrary, the court stated specifically that "whether there is a common[] scheme or plan underlying the acts" is  "[o]ne of the factors considered" when determining whether claims share a sufficient factual nexus.  2011 WL 4688837, at *8 (emphasis added).  It is true that in <u>Lloyds II,</u> this particular factor was deemed by the court to be especially salient – but that does not mean it is dispositive in all cases.  A brief discussion of the issue confronting the court in <u>Lloyds II</u> is in order.

In <u>Lloyds II</u>, Lloyds claimed that two arbitration claims referred to as the Knotts Arbitration and the Colaner Arbitration were interrelated with a third arbitration referred to as the Wahl Arbitration.  2011 WL 4688837, at *8.  The Wahl Arbitration involved twenty-six claimants who collectively alleged that individual brokers or agents working in the same Ohio office sold the claimants unsuitable investments and churned their annuities.  The claimants also alleged and BYA's failure to properly supervise this team of agents allowed their improper activities to occur.  <u>Id.</u> at 4.  The court previously concluded that the twenty-six claims at issue in the Wahl Arbitration arose out of interrelated wrongful acts, citing the claimants' allegations that there was a common scheme or plan underlying  the agents' improper activities.  <u>Id.</u> at 4, 8.  Lloyds then attempted to argue that the Wahl Arbitration was interrelated with the Knotts and Colaner Arbitrations "by a common factual nexus."  <u>Id.</u> at 8.  If all three arbitrations were treated as a single claim, the claim's accrual date would fall outside of the policy period, and Lloyds would owe no coverage.  The court rejected this argument, stating that although there was "some overlap of the allegations and respondents" in the three arbitrations, the existence of a common scheme or plan distinguished the Wahl Arbitration from the others.  <u>Id.</u>  The court explained,

> [O]ne of the factors the Court focused on in determining the twenty-six Wahl claims are interrelated wrongful acts is that each claimant alleged that they were damaged during the same claims-made policy period by the same individual broker/agents in the same office, under an alleged business model in which all of the representatives worked together as a team with respect to each customer – that is, a common scheme or plan underlying the alleged "churning" or "flipping" of the accounts.  By contrast, the Knotts and Colaner Arbitrations do not allege that the same individual respondents acted as a team or that there was any common scheme or plan.  While Lloyds attempts to minimize this distinction, the Court finds it significant; otherwise,

> any claim involving the sale of unsuitable securities involving fraud, misrepresentation or failure to supervise that arose prior to the Lloyds' Policy Period would be deemed interrelated.  As noted when Lloyds accepted the Wahl Arbitration claim, there was nothing in the other Arbitrations to suggest to BYA that there were potential claims beyond those individual claims, that is, a scheme or pattern of wrongful acts.

Id. (footnotes omitted).

It is important to note that in reaching this decision, the court relied on Home Insurance Company of Illinois (New Hampshire) v. Spectrum Information Technologies, Inc., 930 F. Supp. 825, 848 (E.D.N.Y. 1996), for the proposition that the definition of "Interrelated Wrongful Acts" appearing in the policy must be "strictly and narrowly" construed, even though the definition was "broad."  2011 WL 4688837, at *8 & n.35.  As I explained previously, however, the term "interrelated wrongful acts" was given a narrow, pro-insured construction in Home Insurance Company because the term was not defined in the policy.  I do not agree that when the relevant policy includes a broad definition of the term "Interrelated Wrongful Acts," a court should set aside the plain language of that definition in favor of a narrow construction.  See Stauth v. National Union Fire Ins. Co. of Pittsburgh, No. 97-6437, 1999 WL 420401, at *7-8 (10th Cir. 1999).

In any event, it is clear that the existence of a common scheme or plan was central to the court's determination that the individual claims making up the Wahl Arbitration involved interrelated wrongful acts.  It is also clear that the fact that "there was nothing in the [Knotts and Colaner] Arbitrations to suggest to BYA that there were potential claims beyond those individual claims" supported the court's determination that the Knotts and Colaner arbitrations were not interrelated with the Wahl Arbitration.  2011 WL 4688837, at *8.

The instant case is distinguishable from Lloyds II in several respects, however.  It is true that even though the Lee, Murphy, and Kline Enterprises claims all arose during the same time frame, there is no indication that the claims all stemmed from a common scheme or plan executed jointly by BYA's registered representatives.  Nevertheless, the claims do all arise out of the same fraudulent scheme that was allegedly executed by DBSI.  Moreover, unlike Lloyds II, here it cannot be said that "there was nothing . . . to suggest to BYA" that a set of interrelated claims would be filed against it.  2011 WL 4688837, at *8.  On the contrary, it is undisputed that on or about October 3, 2008, BYA notified Lancer "of a potential claim or potential claims involving private placements including 1031

exchanges through DBSI, a product sponsor." (Pl.'s Facts ¶ 33; Defs.' Facts ¶ 33. <u>See also</u> Pl.'s Facts ¶ 35; Pl.'s Index, Ex. A, Miller Aff. Ex. 1, ECF No. 64-2.) In other words, BYA discovered by October 2008 that one or more claims related to DBSI's Section 1031 exchanges could be made. Thereafter, three such claims were indeed filed: Lee filed her claim in June 2009, Murphy filed his claim in January 2009, and Kline Enterprises filed its claim in June 2010. Each claim alleges specifically that BYA's own acts and omissions caused the claimants to lose the investments they made in DBSI's fraudulent business model. (<u>See generally</u> Pl.'s Index, Ex. A, Miller Aff. Exs. 2, 4, 9, ECF Nos. 64-3, 64-5, 64-10.) Although not all of the claimants are California residents and not all were represented by William Rice, the claimants were all connected to DBSI by BYA, and the claims all state similar allegations against BYA. Thus, unlike the three separate sets of arbitration claims discussed in <u>Lloyds II</u>, the Lee, Murphy, and Kline Enterprises claims all stem from the same circumstances, i.e., BYA's promotion of DBSI's allegedly fraudulent investment product.

BYA argues that the DBSI claims are analogous to the claims discussed in <u>Sigma Financial Corporation v. American International Specialty Line Insurance Company</u>, 200 F. Supp. 2d 697, 706-07 (E.D. Mich. 2001), wherein "the court held that the claims brought by customers of the same investment firm who each lost investments due to the failure of the same company were not interrelated because they involved different representatives, different investment products, and different purchasers." (Pl.'s Br. at 11-12, ECF No. 63.) I am not persuaded. In <u>Sigma Financial Corporation</u>, the parties disputed whether a set of claims was based on "a series of continuous, repeated, or interrelated Wrongful Acts" within the meaning of the applicable policy. 200 F. Supp. 2d at 703. Unlike the policies at issue in the instant case, however, "[t]he policy [did] not include a definition of interrelated in its 'Definitions' section." <u>Id.</u> at 704. The court discussed <u>Stauth</u>, noted that courts have taken a "pro-insured approach to defining 'interrelated'" when its meaning is not specified in the policy, concluded that the meaning of "interrelated wrongful acts" was ambiguous, and construed the term against the insurer. <u>Id.</u> at 705-07. As I noted previously, in this case the term "Interrelated Wrongful Acts" is defined broadly in the policy, the term is not ambiguous, and the

term must be given the plain meaning assigned to it by the parties in their policy.  Sigma Financial
Corporation is simply not helpful authority.[12]

In its reply brief, BYA argues that the claimants' allegations of misrepresentation concerned
different parcels of land, which constituted "separate investment products."  (Pl.'s Reply Br. at 20,
ECF No. 78 (arguing that the misrepresentations stated in the claims focus on "the specific TICs in
which the claimants invested," not "on BYA's wholesale approval of all DBSI-sponsored TICs").)
It seems to me, however, that the fact that different parcels of real estate were involved in the claims
is merely incidental.  Collectively, the claims are based on a series of transactions 1) of the same
type, 2) involving the same investment product, 3) involving the same product sponsor, 4) that
occurred in the same time frame, and 5) were allegedly caused by the same Wrongful Acts on the
part of BYA.  This clearly satisfies the Catlin Policy's broad definition of Interrelated Wrongful
Acts.  Under the circumstances, BYA has failed to persuade me that there is not a sufficient factual
nexus between the DBSI claims to warrant a finding that they are "connected by reason of any
common fact, circumstance, situation, transaction, casualty, event, decision, or policy." (Koller Aff.
Ex. 2 at DEFS0441, ECF No. 65-17.)

In summary, BYA has not shown that the DBSI claims lack a sufficient factual nexus, and
it is not entitled to a declaration that the claims do not involve Interrelated Wrongful Acts within the
meaning of the Catlin Policy.

## B.    The Mechikoff Claims

BYA argues that the claims brought by Kaji, Eager-Sabo, and McClintic arise out of
Interrelated Wrongful Acts because "[e]ach of these individuals asserted claims based on the same
aggressive investing scheme allegedly executed by BYA registered representative Richard
Mechikoff." (Pl.'s Br. at 12, ECF No. 63.) BYA also emphasizes that each of the Mechikoff claims

---

[12] Also, I note in passing that although some of the DBSI claims involved different BYA
representatives and all of them involved different customers, they did not involve different
investment products.  Rather, they each involved TIC interests in real estate sponsored by DBSI.
In contrast, the claims at issue in Sigma Financial Corporation involved "a variety of MCA
investment products, including debentures, mortgage pools, and real estate pass-through
certificates." 200 F. Supp. 2d at 703.  Thus, the facts of the instant case are not on all fours with
those of Sigma Financial Corporation.

were brought against BYA by the same attorney; that the claimants were all "elderly individuals residing in California who invested with Mechikoff"; that each claimant "alleged that Mechikoff improperly invested in aggressive stocks," including Arrythmia Research Technology (HRT); and that Mechikoff decided during the spring 2005 to "load up" his clients on the stock.  (Id. at 12-13.) I agree with BYA that there is a suffcient factual nexus between the Kaji, Eager-Sabo, and McClintic Claims, and BYA is entitled to a declaration that the claims arise from Interrelated Wrongful Acts within the meaning of the Catlin Policy.

In opposition to BYA's motion, the defendants argue that the Mechikoff claims are not interrelated because the group consists "of multiple claimants."  (Defs.' Br. at 20, ECF No. 77.)  As I noted above, however, I am not convinced that when the term Interrelated Wrongful Acts is defined broadly (as it is here), claims brought by different claimants cannot satisfy the definition.  See Quanta Lines, 2009 WL 4884096, at *9.

The defendants also argue that the claims are not interrelated because "there is no allegation of a single action taken in conjunction with multiple claimants."  (Defs.' Br. at 20, ECF No. 77.) In other words, the defendants argue that the claims cannot arise from Interrelated Wrongful Acts because "each claimant is alleged to have made its own purchases [of investments], separate and apart from any other claimant."  (Id. at 21.  See also id. at 20 ("There is no allegation that the registered representative [purchased or recommended the stock] through a common presentation to the claimants or through some other single or concerted act.").)  In support of this argument, the defendants rely upon "the rule established in American International Specialty Lines and National Union Fire Insurance."  (Id.)[13]  These cases involve policies wherein the term "interrelated" was not defined, and therefore they are not helpful to my analysis.  See Am. Int'l Specialty Lines Ins. Co., 324 F. Supp. 2d at 359; Nat'l Union Fire Ins. Co., 691 F. Supp. at 622.  In any event, I am not persuaded that the Mechikoff claims fail to satisfy the Catlin Policy's broad definition of Interrelated

---

[13] I take it that the defendants' references are meant to direct me to American Int'l Specialty Lines Ins. Co. v. National Assoc. of Business Owners and Professionals, 324 F. Supp. 2d 353 (E.D.N.Y. 2004), and National Union Fire Insurance Company v. Ambassador Group, Inc., 691 F. Supp. 618 (E.D.N.Y. 1988), which is cited in American International Specialty Lines Insurance Co. at page 360.

Wrongful Acts merely because Kaji, Eager-Sabo, and McClintic did not make all of their purchases following a single presentation by Mechikoff.

Finally, the defendants argue that the Mechikoff claims do not arise from Interrelated Wrongful Acts "because the various claimants did not allege that the wrongful acts were directed at other claimants as part of a common scheme or plan, even though the underlying allged conduct was virtually identical." (Defs.' Br. at 21, ECF No. 77. See also id. at 23 ("New York law . . . does not recognize 'bald allegations of conspiracy' as a sufficient adhesive to bind together otherwise distinct claims." (citing Home Insurance Company of Illinois (New Hampshire) v. Spectrum Information Technologies, Inc., 930 F. Supp. 825, 851 (E.D.N.Y. 1996)).)   As I explained previously, an allegation of a common scheme or plan is merely one factor to consider when determining whether there is a sufficient factual nexus between claims; the absence of such an allegation is not dispositive of the issue.   Moreover, it seems to me that the Mechikoff claims do allege that a common scheme or plan existed.

In short, there is a sufficient factual nexus between the Mechikoff claims, and summary judgment will be granted in BYA's favor.

## C.   The Forward Investments/Shaw Claims

BYA argues that the Hannigan, Peralta, Borowski, and Homis claims arise out of Interrelated Wrongful Acts, as that term is defined in the Syndicate Policy.   (Pl.'s Br. at 15-16, ECF No. 63.) More specifically, BYA states,

> Each of these claimants alleged that they were wronged through the acts of BYA registered representative Kelvin Shaw ("Shaw").   In addition, each claimant alleged that sometime in 2007 or 2008 Shaw, assisted by Jennifer Himes ("Himes") in three of the four claims, induced them to invest in a purported commodity pool known as [Forward Investments].   Each of the claimants alleged that Forward Investments turned out to be a scam and, consequently, they lost all or nearly all of the money they invested.   Each of the claimants also alleged that Shaw provided them with fraudulent information regarding the success of Forward Investments either before their investment, after, or both.   Each of the claimants alleged that Forward Investments was operated by Robert Bame and that Bame was later investigated and indicted for running a fraudulent scheme.

Id. at 16 (citations omitted).)  I agree with BYA that there is a sufficient factual nexus between each of the Forward Investments/Shaw claims, and BYA is entitled to a declaration that all of these claims arise out of Interrelated Wrongful Acts.

In opposition to BYA's motion, the defendants repeat their argument that the claims are not interrelated because multiple claimants are involved, "there is no allegation of a single action taken in conjunction with multiple claimants," and the various claimants did not allege that they fell victim to a common scheme or plan.  (Defs.' Br. at 20-23, ECF No. 77.)  For the reasons explained in Part III.B above, I reject the defendants' arguments.

The defendants also argue that although "Peralta, Hannigan, Borowski, and Homis all assert claims based upon their losses associated with purchases in Forward Investments Group," "the manner in which each came to the complained-about transactions is different," and "each of the respective claimants has asserted its own respective discrete claim for damages."  (Defs.' Br. at 20-21, ECF No. 77 (emphasis in original).)  The defendants' observations appear to be correct, but I remain convinced that the Forward Investments/Shaw claims share a sufficient factual nexus even though the claimants did not all come to Shaw in a single group, and even though they each suffered "discrete" damages due to the Forward Investments scam.

The Peralta, Hannigan, Borowski, and Homis claims arise out of Interrelated Wrongful Acts, and BYA's motion for summary judgment on this issue will be granted.

### D.    The Straub and Lawrence Claims

Finally, BYA argues that it is entitled to a declaration that the Straub and Lawrence claims arise out of Interrelated Wrongful Acts for the purposes of the Catlin Policy.  As BYA correctly notes, both the Straubs and Lawrences filed arbitration claims against BYA stating that 1) they were elderly couples residing in Ohio; 2) they were customers of BYA and B & G; 3) a group of registered representatives of BYA and B & G sold them Allianz Life Insurance annuities to replace American National Insurance annuities that had been purchased approximately one year previously; 4) the inappropriate annuity purchases caused them to incur surrender fees, costs, and expenses; and 5) there was significant overlap between the individuals who sold the Straubs and Lawrences the

unsuitable annuities.[14]  I agree with BYA that there is a sufficient factual nexus between the Straub and Lawrence claims, and the claims arise out of Interrelated Wrongful Acts for the purposes of the Catlin Policy.

Once again, the defendants repeat their arguments that the claims are not interrelated because the claims involve multiple claimants, "there is no allegation of a single action taken in conjunction with multiple claimants," and the various claimants did not allege that they fell victim to a common scheme or plan.  (Defs.' Br. at 20-23, ECF No. 77.)  For the reasons explained above, I find that these arguments are not persuasive.

The defendants also argue that the claims are not interrelated because the "identities of the registered representatives are not identical," and "[e]ach claimant seeks damages specific to its own losses."  (Defs.' Br. at 20, ECF No. 77.)  It is true that the Straubs and Lawrences each filed claims seeking to recover their own losses.  It is also true that some of the registered representatives who worked with the Straubs did not work with the Lawrences, and vice-versa.  Under the terms of the Catlin Policy, however, the claims need not be identical to arise out of Interrelated Wrongful Acts. The nexus between the claims is sufficient, and BYA is entitled to summary judgment on this issue.

**IT IS ORDERED** that BYA's motion for partial summary judgment, ECF No. 62, is granted in part.  The Kaji, Eager-Sabo, and McClintic claims (i.e., the Mechikoff claims) involve Interrelated Wrongful Acts and constitute one Claim under the governing policy; the Hannigan, Peralta, Borowski, and Homis claims (i.e., the Forward Investments/Shaw claims) involve Interrelated Wrongful Acts and constitute one Claim under the governing policy; and the Straub and Lawrence claims involve Interrelated Wrongful Acts and constitute one Claim under the governing policy.

Dated November 14, 2012.

BY THE COURT

_Warren K. Urbom_
_____
United States Senior District Judge

---

[14] More specifically, the Straubs alleged that Gergel, Farrar, Brandt, and Snyder, Jr. sold them the Allianz Life Insurance annuities, while the Lawrences alleged that Gergel, Farrar, Brandt, Snyder, Sr., and Balser sold them the Allianz Life Insurance annuities.

27